**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

In re MICHAEL WOLF, )
)
       Debtor. )
)
------------------------------------------------- )
)
N. NEVILLE REID, not individually, )
but solely in his capacity as Chapter 7 )
Trustee of the bankruptcy estate of )
Michael A. Wolf, et al., )
)
       Plaintiffs-Appellees, )
)
       v. )
)
MICHAEL WOLF, SCOTT WOLF, et )
al., )
)
       Defendants-Appellants. )

Nos. 18 C 07952, 18 C 07953,
19 C 01978, 19 C 08154, and
19 C 08299

Judge John J. Tharp, Jr.

(Bankr. No. 14 B 27066)

## MEMORANDUM OPINION AND ORDER

     This is a bankruptcy appeal concerning the debtor's pre-petition transfer of assets. Michael Wolf owned and published a commercial trade magazine for many years before he and his wife, Elizabeth Wolf, separated. In anticipation of divorce, Michael conveyed the publication to his son, Scott Wolf, through the conduit of various sham corporations.[1] After Elizabeth filed for divorce, Michael filed Chapter 7 bankruptcy. Neville Reid was appointed as Trustee to oversee the bankruptcy estate.

     Michael's bankruptcy case centered on the Trustee's attempt to avoid three fraudulent transfers of assets related to Michael's publishing business. Amid labyrinthine adversarial proceedings, the bankruptcy court sanctioned Michael and Scott with default and, for reasons

---

[1] To avoid confusion arising from their common last name, this opinion will refer to the various members of the Wolf family by their first names.

explained in a comprehensive and careful opinion, issued a final default judgment against them for the value of Michael's business.

Michael and Scott now appeal a litany of the bankruptcy court's rulings. They challenge the bankruptcy court's designation of certain shareholder interests as vested within Michael's bankruptcy estate—a ruling based primarily on how Michael's divorce judgment divided his marital property. They also challenge the use of Illinois law to pierce the veil of one of Michael's corporations; the sufficiency of the Trustee's complaint; the denial of Michael's discharge; the dismissal of their third-party complaint against the Trustee; and the bankruptcy court's refusal to award Michael and Scott costs. This Court concludes that the bankruptcy court ruled correctly in all ways except one. Because that error is harmless, the judgment is affirmed.

## I. PROCEDURAL POSTURE

Given the lens through which the facts in this case are viewed, it is important to establish the procedural posture at the outset.

This Court sits in review of the bankruptcy court's final default judgment pursuant to 28 U.S.C. § 158(a). The bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact are reviewed for clear error. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). The bankruptcy court's proposed findings of fact and conclusions of law are reviewed *de novo*. 28 U.S.C. § 157(c)(1).

Here, the bankruptcy court below entered default against all defendants. "Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true." *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The defendants, however, do not appeal any entry of default, *see* part III; therefore, they waive their challenge to the bankruptcy court's findings of fact. *Cf. In re Sharma*, No. CC–12–1302–

2

MkTaMo, 2013 WL 1987351, at *9 (B.A.P. 9th Cir. May 14, 2013), *aff'd*, 607 F. App'x 713 (9th Cir. 2015) (on appeal of a default judgment, the issue becomes "whether the facts alleged in the Complaint, and deemed true upon . . . default, support the bankruptcy court's determination"). The bankruptcy court sourced its facts, as this Court does here, from the well-pled allegations within the Trustee's operative complaint. *See* First Am. Compl., *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. May 31, 2016), ECF No. 95 ("FAC"). Winnowed of inconsequential detail, those facts are as follows.

## II. BACKGROUND

Michael and Elizabeth Wolf married in 1975 and in the ensuing decades Michael published a successful trade publication for the commercial furniture industry entitled Monday Morning Quarterback (MMQB). The publication was nominally owned and distributed by Zig-Zag Corp., although Michael was Zig-Zag Corp.'s sole owner and used Zig-Zag Corp. to pay his and his family's personal creditors. Then in 2011, Michael and Elizabeth separated.

Following separation from his wife and in anticipation of his impending divorce, Michael began making moves to shield MMQB assets and proceeds from his existing and prospective creditors—most prominently, Elizabeth. First, in 2012, Michael transferred the MMQB business from Zig-Zag Corp. to a shell company he created called ZZC, Inc. ("Transfer No. 1"). According to ZZC, Inc.'s 2012 tax return, Michael wholly owned ZZC, Inc. At some point after 2012, however, Michael transferred 51% of the stock in ZZC, Inc. to his adult son, Scott Wolf ("Transfer No. 2"). Between December 2013 and July 2014, Michael also personally gave ZZC, Inc. a total of $234,396 to satisfy a promissory note—debt the Trustee characterizes as illusory. Finally, in January 2014, Scott (as the controlling shareholder of ZZC, Inc.) transferred the MMQB business yet again to another token entity called MMQB, Inc. ("Transfer No. 3").

Scott was the sole owner of MMQB, Inc. and he, much like his father with Zig-Zag Corp., disregarded corporate formalities and used MMQB, Inc. to furtively siphon MMQB proceeds into his and his father's hands. No consideration was given and no written agreement was used for any of the three transfers just described.

About a month prior to Transfer No. 3, Elizabeth petitioned for divorce. In due course, the Circuit Court of Lake County, Illinois, awarded Elizabeth temporary maintenance. For that purpose, the Circuit Court ordered Michael to sell his custom Aston Martin luxury automobile and surrender the proceeds. Michael then "sold" the vehicle for less than its market value to yet another sham entity wholly owned by Scott (Ma Cherie LLC)—who, in turn, allowed Michael to retain possession of the car. When Michael refused to relinquish even these proceeds, he was held in contempt and sentenced to fourteen days in jail. Mercifully, the Circuit Court allotted him fourteen days to purge the contempt. Instead of purging, however, on July 23, 2014, Michael filed a Chapter 7 bankruptcy petition to stay his contempt proceeding.[2] The stay also precluded the Circuit Court from dividing Michael and Elizabeth's marital property. Yet soon thereafter, the bankruptcy court modified the stay to permit the Circuit Court "to determine the appropriate allocation of marital property, including any property of the bankruptcy estate . . . ." Order 2, *In re Wolf*, No. 14-bk-27066 (Bankr. N.D. Ill. Nov. 19, 2014), ECF No. 53.

The chart below provides a graphic summary of the transfers at the core of this appeal:

---

[2] It is unclear whether the Circuit Court treated Michael's contempt proceeding as automatically stayed. The bankruptcy court itself appeared uncertain as to whether 11 U.S.C. § 362(a)(1) required it. *See* Order 2, *In re Wolf*, No. 14-bk-27066 (Bankr. N.D. Ill. Nov. 19, 2014), ECF No. 53 (noting that the "automatic stay ***potentially*** does apply to the contempt proceedings" (emphasis added)). In any case, Michael successfully forestalled his incarceration by convincing the Circuit Court that he was precluded from purging his contempt because all of his assets were confined within his bankruptcy estate. *See* Trustee Br. 121, No. 18-cv-07952, ECF No. 41 (citing Circuit Court filings).

**Overview of Property Interests and Transfers[3]**



Meanwhile in bankruptcy court, the Trustee initiated an adversarial proceeding against Michael and Scott to avoid Transfers Nos. 1–3 and recover to the estate the value of the MMQB business. Initially, to accord with Local Bankruptcy Rule 7020-1, the bankruptcy court ordered this adversarial proceeding split into seven different proceedings.[4] Shortly after the Trustee complied, the bankruptcy court reevaluated Rule 7020-1's import, determined that separate proceedings were not necessary, and granted the Trustee leave to file an amended complaint reconsolidating the seven proceedings. Before the Trustee refiled, however, Michael filed his

---

[3] The "C" affixed to Michael's January 2014 interests indicates the interests are contingent. Upon petition for divorce, both Michael and Elizabeth hold a contingent interest in all marital property. These contingent interests either ripen or vanish depending on how martial property is eventually divided by Michael's December 2017 judgment for dissolution of marriage. *See* part IV.A.

[4] Local Bankruptcy Rule 7020-1 has since been repealed.

5

own third-party complaint in five of the proceedings, prompting the bankruptcy court to vacate its consolidation order. Michael's second adult son, Peter, joined this complaint; his interests are discussed in part IV.E below.

Michael's third-party complaint, in the view of the bankruptcy court, was nothing more than an "attempt[] to stop the Adversary litigation and create more expense, all to frustrate the Trustee into halting the marshaling of that assets belonging to the Debtor's estate." Dismissal Order 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Dec. 16, 2016), ECF No. 407. In substance, it was a 374-page, 108-count "rambling narrative" brought against thirty-eight individuals and law firms, including the Trustee, the Trustee's counsel, and every member of the counsel's law firm. *Id*. The complaint's "length, redundancy and irrelevant nature" made it "nearly impossible to follow or analyze," and therefore, the bankruptcy court dismissed it for failure to comply with Federal Rule of Civil Procedure 8(a)'s short, plain statement requirement. *Id*. at 3. Because the bankruptcy court also held that Michael's complaint, even if stated succinctly, could not state judicial actions in light of *Barton v. Barbour*, 104 U.S. 126 (1881), and other statutory impediments, the dismissal was issued with prejudice. *Id.* at 4; *see generally Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (explaining that a bankruptcy trustee, under the *Barton* doctrine, cannot be sued without leave of the court that appointed him).

During the contentious discovery period that followed, Michael repeatedly refused to comply with the bankruptcy court's discovery orders; and so, the bankruptcy court entered default against him. For similar reasons, the same sanction befell Scott. Zig-Zag Corp., ZZC, Inc., and MMQB, Inc. all failed to defend, so they too were held in default.

An entry of default only establishes liability, it does not itself determine a plaintiff's right to relief. *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). For

a default judgment to enter against a defendant in default, it is still left to the plaintiff to establish an entitlement to relief. *Id.* As noted previously, for this purpose, "the well-pleaded allegations of a complaint relating to liability are taken as true." *Id.* (quoting *Dundee*, 722 F.2d at 1323).

The Trustee's operative complaint alleged twenty-eight counts against eight defaulted defendants. The bankruptcy court ultimately held that twelve counts—asserted against Michael, Scott, Zig-Zag Corp., ZZC, Inc., and MMQB, Inc.—entitled the Trustee to relief. In reaching this conclusion, the bankruptcy court held that it had both statutory and constitutional authority to issue final judgment on most counts. *In re Wolf*, 595 B.R. 735, 749–52 (Bankr. N.D. Ill. 2018); *accord* 28 U.S.C. § 157(b); *Stern v. Marshall*, 564 U.S. 462 (2011). For the remainder, it held it had the consent of the parties to issue the same. *In re Wolf*, 595 B.R. at 752–54; *accord* 28 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). The only exception involved the counts asserted against MMQB, Inc. for which the bankruptcy court held it lacked both authority and consent to issue final judgment. For this reason, the rulings against MMQB, Inc., and only those, take the form of proposed findings of fact and conclusions of law.

The bankruptcy court's final default judgment comprises three components. First, the bankruptcy court held that the Trustee may avoid and recover as preferential transfers the $234,396 in payments Michael made to ZZC, Inc. within the year prior to Michael's bankruptcy petition. *In re Wolf*, 595 B.R. at 783; *accord* 11 U.S.C. § 547. (This component is noted for completeness; it is not challenged on appeal.) Second, the bankruptcy court denied Michael's discharge. This component is the only component of the default judgment rendered against Michael directly. The bankruptcy court found that four exceptions to the presumption of discharge applied: (1) Michael "intend[ed] to hinder, delay, or defraud a creditor" when he—in contempt of the Illinois Circuit Court—fraudulently transferred his Aston Martin instead of

selling it to pay Elizabeth's temporary maintenance, *see* 11 U.S.C. § 727(a)(2); (2) Michael "failed to keep or preserve any recorded information" about his ownership interests in ZZC, Inc., *see id.* § 727(a)(3); (3) Michael "knowingly . . . made a false oath" about his ownership interests in ZZC, Inc., *see id.* § 727(a)(4); and (4) Michael had "failed to explain satisfactorily" Transfers Nos. 1–3, which caused a "deficiency of assets to meet [his] liabilities," *see id.* § 727(a)(5). *In re Wolf*, 595 B.R. at 786–87. Finally, as the third component of the default judgment, ZZC, Inc., MMQB, Inc., and Scott were held jointly and severally liable for the value of the MMQB business—found to be $2,100,000. *Id.* at 793–94.

Numerous theories of relief applicable to Transfers Nos. 1–3 undergird the default judgment's third component. As for Transfer No. 1—the transfer of the MMQB business from Zig-Zag Corp. to ZZC, Inc.—the bankruptcy court found it to be both actually and constructively fraudulent and therefore avoidable by the Trustee under Illinois' Uniform Fraudulent Transfer Act (UFTA), 740 Ill. Comp. Stat. 160/5(a), 6(a) (incorporated by 11 U.S.C. § 544(b)). *In re Wolf*, 595 B.R. at 778–82. A bankruptcy trustee's avoidance powers are generally limited to "transfer[s] of an interest of the debtor in property." *See, e.g.*, 11 U.S.C. § 544(b). Transfer No. 1, however, involved the transfer of Zig-Zag Corp.'s legal interest, not Michael's. Nonetheless, the bankruptcy court held that the Trustee could still avoid Transfer No. 1 by reverse veil piercing under 11 U.S.C. § 544(a). In granting this claim, the bankruptcy court invoked the alter ego doctrine and found that

> Michael Wolf failed to observe corporate formalities and commingled funds by paying personal and family expenses . . . directly with corporate funds, diverted assets from Zig Zag to a closely related entity (ZZC) to the detriment of creditors, and, in transferring the MMQB business assets for no consideration to ZZC, failed to maintain ***arms-length*** relationships among related entities. Also, the fact that Michael Wolf, as alleged, continues to run the MMQB business and continues to receive income from it,

> along with the fact that he built and ran the business for nearly
> three decades, points to Zig Zag having been used as a mere façade
> for the operation of its **sole** stockholder, Michael Wolf. Thus, . . .
> Zig Zag and Michael Wolf should be treated as the same legal
> personality.

*In re Wolf*, 595 B.R. at 769 (citations omitted; emphasis in original). Given the Trustee's right to

avoid Transfer No. 1 and recover the value of the MMQB business (*i.e.*, $2,100,000), the

bankruptcy court held ZZC, Inc. (as the initial transferee) and MMQB, Inc. (as the subsequent

transferee) jointly and severally liable. *Id.* at 788–92; *accord* 11 U.S.C. § 550(a). It similarly held

Scott liable as a subsequent transferee under the theory that MMQB, Inc. was Scott's alter ego.

*In re Wolf*, 595 B.R. at 789–90.

As for Transfer No. 2—the transfer of 51% of ZZC, Inc.'s stock from Michael to Scott—

the bankruptcy court found that it too was both actually and constructively fraudulent under

UFTA sections 5(a) and 6(a), as incorporated by 11 U.S.C. § 544(b). *In re Wolf*, 595 B.R. at

778–83. The court also held that 11 U.S.C. § 548—the Bankruptcy Code's organic fraudulent

transfer provision—independently supported the right to relief. *Id.* at 775–78. As the initial

transferee, Scott was held liable for the value of 51% of ZZC, Inc.'s stock and, because the only

asset ZZC, Inc. held was the MMQB business, this value was found to be equivalent to 51% of

the MMQB business's value (*i.e.*, 51% of $2,100,000). *Id.* at 792–93. In so ruling, the

bankruptcy court rejected Scott's argument that the Trustee's operative complaint failed under

Federal Rule of Civil Procedure 9(b) to allege fraud with particularity.

Finally, as for Transfer No. 3—the transfer of the MMQB business from ZZC, Inc. to

MMQB, Inc.—the bankruptcy court held that Scott (as the controlling shareholder of ZZC, Inc.)

was liable under the Illinois Business Corporation Act, 805 Ill. Comp. Stat. 5/12.56, to

shareholders for transferring ZZC, Inc. assets to another corporation for no consideration. *In re

Wolf*, 595 B.R. at 784–86. Assuming Michael maintained a pre-bankruptcy shareholder interest

in ZZC, Inc., the right to recover under this corporate waste claim vested in Michael's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1). But Transfer No. 3 occurred after Elizabeth petitioned for divorce, and so whether or not Michael's pre-divorce interests (especially his interest in 49% of ZZC, Inc.'s stock) transferred to his bankruptcy estate depended on how the Illinois Circuit Court divided Michael's marital estate. That division occurred in December 2017 by way of a judgment for dissolution of marriage, which awarded the ***entire*** marital estate to Elizabeth. The judgment also listed—in an inarguably circuitous way—what property comprised Michael and Elizabeth's marital estate, and the bankruptcy court construed from this list that ***none*** of Michael's pre-divorce interests in ZZC, Inc. were included. *In re Wolf*, 595 B.R. at 755–56. Accordingly, because Michael's shareholder interests were not lost to Elizabeth prior to bankruptcy, the bankruptcy court determined that 49% of ZZC, Inc.'s stock vested in Michael's bankruptcy estate; and so, the Trustee was entitled to recover 49% of the corporate waste (*i.e.*, 49% of $2,100,000) from Scott. *Id.* at 793.

The following table summarizes the components of the default judgment entered by the bankruptcy court:

### Summary of Default Judgment

| Def. | Liability | Right to Relief | | Factual Basis | Damages |
|------|-----------|-----------------|---|---------------|---------|
| Michael | Denial of Discharge | § 727(a)(2)-(5) | | Fraudulent Transfer; Failure to Keep Records; Lying Under Oath; Failure to Explain Loss | n/a |
| | Reverse Veil Piercing | § 544(a) | | Alter Ego (Zig-Zag Corp.) | n/a |
| ZZC, Inc. | Fraudulent Conveyance (Actual & Constructive) | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) UFTA § 6(a) | Transfer No. 1 (Initial Transferee) | $2.1M |
| | Preferential Transfers | § 547 | | Michael's Payments to ZZC, Inc. | $234k |
| MMQB, Inc. | Fraudulent Conveyance (Actual & Constructive) | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) | Transfer No. 1 (Subsequent Transferee) | $2.1M |
| Scott | Veil Piercing | § 544(a) | | Alter Ego (MMQB, Inc.) | $2.1M |
| | Fraudulent Conveyance (Actual & Constructive) | § 548(a)(1)(A) § 548(a)(1)(B) | | Transfer No. 2 (Initial Transferee) | $1.071M |
| | | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) UFTA § 6(a) | | |
| | Corporate Waste | § 541(a)(1) | 805 ILCS 5/12.56 | Transfer No. 3 | $1.029M |

The default judgment terminated "in all respects" the adversarial proceedings against the defaulted defendants, *id.* at 794; yet several of the seven total adversarial proceedings remained active. These ongoing proceedings involved claims against various additional sham entities (such as Hound Ventures, Inc. and SHBM, Inc.) that Michael and Scott used to siphon off MMQB proceeds. Although the default judgment allowed the Trustee to recover the ***value*** of the MMQB business, the bankruptcy court precluded the Trustee from recovering transferred MMQB ***proceeds*** without submitting further evidence to ascertain their amounts. *In re Wolf*, 595 B.R. at 791 & n.47. The Trustee determined, however, that Michael's bankruptcy estate could not afford an additional forensic investigation into the transferred proceeds; and therefore, moved to dismiss the remaining adversarial proceedings. Mot. to Dismiss 4, *In re Wolf*, No. 16-ap-00482

11

(Bankr. N.D. Ill. Sept. 26, 2019), ECF No. 89; *see also id.* at 1–4 (summarizing relevant procedural history). Subsequently, Michael and Scott—who were nominally still defendants in these proceedings and who, upon voluntary dismissal, characterized themselves as prevailing parties—requested costs under Federal Rule of Civil Procedure 54. In the alternative, they also requested sanctions against the Trustee for "multipl[ying] the proceedings . . . unreasonably and vexatiously." *See* 28 U.S.C. § 1927. Both requests were denied.

Michael and Scott now appeal *pro se*.

### III. ISSUES PRESENTED

This matter consolidates six appeals and one petition for review of the bankruptcy court's proposed findings of fact and conclusions of law.[5] All were born from three adversarial proceedings.[6] In the aggregate, Michael and Scott assign error to an unfathomable number of issues. Between the first two docketed cases alone, Michael and Scott purport to appeal seventy-nine issues across twenty-eight rulings. Yet they support only a few with adequate argument. For this reason, the vast majority are forfeited. *See Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019) ("A party . . . generally forfeits issues and arguments it fails to raise in its initial appellate brief. Insufficiently developed issues and arguments are also forfeited." (citations omitted)).

Most notably, included within these forfeit arguments is any challenge to the bankruptcy court's entries of default. In their respective statements of issues, Michael and Scott both assign error to the default entered against them, but nowhere in either of their briefs is argument offered as to why the default entries were infirm. The only exception is a solitary, throw-away comment that appears in Michael's conclusion, stating that he "should not have been held in default"

---

[5] Cases Nos. 19-cv-08162 and 19-cv-08302 have been consolidated with the five cases identified in the caption and administratively terminated.

[6] Adversarial Proceedings Nos. 16-ap-00066, 16-ap-00482, and 16-ap-00485.

because the claims against him are "moot." Michael Br. 23, No. 18-cv-07952, ECF No. 28. Also forfeit is any challenge to two orders of civil contempt issued against Michael and Scott following the final default judgment. Those orders are the subject of appeals Nos. 19-cv-08299 and 19-cv-08302; however, neither Michael nor Scott submitted a brief for these appeals.

The Trustee is the predominant appellee in these matters. Others join him, and their briefs have informed this opinion. However, their interests are aligned with the Trustee's, so it serves no purpose to detail their particular concerns. Additionally, the Trustee has filed a cross-appeal in the three lowest-numbered cases. He presents each cross-appeal as conditional—in other words, arguments that support the bankruptcy court's holdings for alternative reasons not discussed by the bankruptcy court. As such, the Trustee's cross-appeal is only addressed where relevant to reversible error.

In view of the foregoing, this Court finds only the following issues sufficiently presented for review:

> a.   Whether the bankruptcy court misinterpreted how Michael's judgment for dissolution of marriage divided his marital property, and if so, what effect that misinterpretation had on the property interests recovered by the Trustee.

> b.   Whether the bankruptcy court misapplied Illinois law when granting the Trustee's reverse veil piercing claim—a necessary predicate to the fraudulent transfer claims associated with Transfer No. 1.

> c.   Whether the bankruptcy court erred in denying Scott's Federal Rule of Civil Procedure 9(b) challenge to the fraudulent transfer claims associated with Transfer No. 2.

> d.   Whether the bankruptcy court erred in denying Michael's discharge.

e.  Whether the bankruptcy court erred in dismissing Michael's third-party complaint with prejudice under Federal Rule of Civil Procedure 8(a) and the *Barton* doctrine.

f.  Whether the bankruptcy court erred in denying Michael and Scott costs in the voluntarily dismissed adversarial proceedings, and if not, whether Michael and Scott's appeal of the issue is frivolous under Federal Rule of Appellate Procedure 38.

## IV. DISCUSSION

The two overarching goals of bankruptcy law are to promote equality of distribution among similarly situated creditors and to afford the honest debtor a fresh economic start. *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554–55 (1915). In service of the former, it is a Chapter 7 trustee's duty to collect and liquidate the property of the bankruptcy estate. 11 U.S.C. § 704(a)(1). The first two questions presented here concern whether relevant property interests were appropriately deemed property of Michael's bankruptcy estate.

Unless exempted, a bankruptcy estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). These interests are broadly construed to include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative . . . ." *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993), *abrogated on other grounds by Law v. Siegel*, 571 U.S. 415 (2014). In general, then, any property interest (as defined by state law, *Rodriguez v. Federal Deposit Insurance Corp.*, 140 S. Ct. 713, 718 (2020)) that a debtor holds on the day bankruptcy begins vests in the bankruptcy estate for the purpose of satisfying creditors. *Matter of Burciaga*, 944 F.3d 681, 685 (7th Cir. 2019).

Although section 541(a)(1) often provides the bulk of bankruptcy estate assets, the trustee's avoidance powers also allow the trustee to enlarge the property of the estate after commencement of the case. *See* 11 U.S.C. §§ 542–53; Robert E. Ginsberg et al., Ginsberg & Martin on Bankruptcy § 8.01 (5th ed. 2021) ("An avoiding power is the power of the trustee to undo certain voluntary or involuntary transfers of the debtor's interests in property to bring the property back into the bankruptcy estate for distribution purposes."). Three variations of those powers are relevant here.

Section 544(a), known as the "strong-arm power," allows a trustee to avoid most unperfected and incomplete transfers of the debtor's real and personal property. *See* 11 U.S.C. § 544(a). More importantly, for present purposes, section 544(a) also equips a trustee with "the rights and powers of" creditors. *Id*. In this capacity, "the trustee has the sole right and responsibility to bring claims on behalf . . . of creditors as a class—so-called 'general' claims." *In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009) (citing *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987)). "Individual creditors," however, "retain the right to bring 'personal' claims that do not implicate the trustee's purpose." *Id*. Personal claims are defined as "those in which the claimant is harmed and 'no other claimant or creditor has an interest in the cause.'" *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (quoting *Koch*, 831 F.2d at 1348); *see, e.g.*, *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) (RICO plaintiffs were entitled to sue on their own for injuries that resulted from the diversion of corporate assets and were distinct from the injuries to creditors in general).

Whereas section 544(a) allows for avoidance of unperfected and incomplete transfers, sections 544(b) and 548 allow for avoidance of fraudulent transfers. Under section 544(b), "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under

applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1). This "enables a trustee to step into the shoes of an unsecured creditor who existed at the time of the transfer and vindicate that creditor's state-law rights." *In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 811 (7th Cir. 2019). Similarly, under section 548, "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property" if the debtor made the transfer with either (A) the "actual intent to hinder, delay, or defraud" a creditor, or where (B) the debtor "received less than a reasonably equivalent value in exchange for such transfer" and was insolvent on the date of transfer or became insolvent because of the transfer or made the transfer to benefit an insider. 11 U.S.C. § 548(a). Sections 544(b) and 548 serve the same ends; however, section 548 does not rely on state fraudulent transfer laws, is therefore not vulnerable to state-law defenses, but carries a more-restrictive statute of limitations. *Compare id.* (2 years), *with* 740 Ill. Comp. Stat. 160/10 (4 years).

With the legal framework established, Michael and Scott's arguments may be addressed.

## A.     Marital Property Division

As shown, sections 541, 544, and 548 are all tethered in one way or another to the debtor's interests in property. Michael and Scott argue that the Trustee has no justifiable claim under any of these statutes because Michael simply did not possess ***any*** interests in property on the day he petitioned for bankruptcy. To reach this conclusion, they contend that the bankruptcy court misinterpreted how Michael's judgment for dissolution of marriage divided his marital property between he and Elizabeth.

Their logic goes like this: Elizabeth petitioned for divorce eight months prior to the commencement of Michael's bankruptcy. When she did, Michael acquired a contingent interest in their marital estate, which, he says, comprised everything he owned. Most relevantly, at that

time, everything Michael owned included a 100% interest in Zig-Zag Corp. and a 49% interest in ZZC, Inc. These ***contingent*** interests are what vested in Michael's bankruptcy estate, and when the Illinois Circuit Court eventually awarded the entire marital estate to Elizabeth, the contingent interests vanished, leaving no debtor property interests within the bankruptcy estate for the Trustee to claim or recover.

Michael and Scott are correct when it comes to their application of the Illinois Marriage and Dissolution of Marriage Act, 750 Ill. Comp. Stat. 5/101–802:

> Unlike community-property states, Illinois law does not establish independent ownership interests in marital property at the moment it is acquired. Nor does Illinois wait to establish such interests until the divorce court issues a final order. Instead, Illinois occupies a middle ground. Divorcing spouses are vested with independent contingent interests in all marital property at the moment a divorce petition is filed. When the divorce court eventually divides marital property, the obtaining spouse's contingent interest in that property ripens into a full ownership interest. Conversely, the spouse who is not awarded the property sees his contingent interest vanish.

*In re Thorpe*, 881 F.3d 536, 540 (7th Cir. 2018); *see also* 750 Ill. Comp. Stat. 5/503(e) ("Each spouse has a species of common ownership in the marital property which vests at the time dissolution proceedings are commenced and continues only during the pendency of the action."); *Kujawinski v. Kujawinski*, 71 Ill. 2d 563, 573 (1978) ("The [Illinois Marriage and Dissolution of Marriage] Act does not purport to affect property interests during the marriage. The term 'marital property' is a nomenclature devised to realize an equitable distribution of property upon termination of the marriage. Operation of the term 'marital property' under the Act is not triggered until the time of dissolution.").

So, indeed, any contingent marital interests which succeeded to Michael's bankruptcy estate vanished when the Illinois Circuit Court eventually awarded the entire marital estate to Elizabeth. But Michael and Scott disagree with the bankruptcy court as to what comprised

Michael's marital estate. Michael's judgment for dissolution of marriage is the authority on that question. In relevant part, it states:

> [Elizabeth] is awarded the marital estate, comprised of [Michael's] 49% interest in Zig Zag Corporation, the proceeds from the sale of [various real property], the Fiat automobile, [and] the Mercedes Benz [Elizabeth] drives.

J. for Dissolution of Marriage 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (judgment entered Dec. 15, 2017). Had the judgment stopped there, there would be little room for disagreement as to what property comprised Michael's marital estate. The judgment, however, also notes that its attached "Findings and Rulings" are "incorporated herein by reference as though set forth *verbatim* herein." *Id*. Those findings explain:

> [Michael] asserts no interest in any martial assets and assigns any interest that he might have in Zig Zag Corporation, the proceeds from the sale of [various real property], a Fiat automobile, the Mercedes Benz that [Elizabeth] drives, his forty-nine per cent (49%) interest in Zig Zag Corporation and any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter-claim on file) to [Elizabeth]. Based upon [Michael's] offer, the Court will . . . award those properties to [Elizabeth] . . . .

Findings & Rulings 3, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (dated Nov. 13, 2017).

Thus, in the same breath, the Circuit Court's "Findings and Rulings" award Elizabeth "any interest [Michael] might have" in Zig-Zag Corp. **and** Michael's "forty-nine per cent (49%) interest" in Zig-Zag Corp. *Id*. The two statements are not necessarily incongruent, but they suggest something is confused. The bankruptcy court noted this ambiguity but found that the statements did not obscure the judgment's main-body text. *See In re Wolf*, 595 B.R. at 756 n.17. The bankruptcy court reasoned that notwithstanding the incorporated "Findings and Rulings," the judgment's main-body text alone denoted what property comprised Michael's marital estate.

18

*See id*. That text clearly states that 49% of Michael's interest in Zig-Zag Corp. was a part of his marital estate. More importantly, the text also omits any reference to Michael's 49% interest in ZZC, Inc. Hence, the bankruptcy court ultimately found, as the logical corollary to its disregard of the "Findings and Rulings" portion of the divorce judgment, that 51% of Michael's interest in Zig-Zag Corp. and his 49% interest in ZZC, Inc. remained outside Michael's marital estate and succeeded to his bankruptcy estate unencumbered. *Id.* at 756.

Michael and Scott argue that the bankruptcy court's reading of the divorce judgment is wrong. They press a different interpretation: that, in actuality, the judgment assigned ***all*** of Michael interests in Zig-Zag Corp. and ZZC, Inc. to his marital estate and thereby left no interests to succeed unencumbered to his bankruptcy estate. This Court agrees.

To begin, although the divorce judgment's main-body text is clear when read in isolation, it is unreasonable to simply disregard the "Findings and Rulings," which are expressly incorporated into the judgment. The noted ambiguity within the "Findings and Rulings" must therefore be resolved. The "Findings and Rulings" make two consecutive references to Michael's interests in Zig-Zag Corp. The first is equivocal ("any interest that he might have"); the second is defined ("his forty-nine per cent (49%) interest"). In order to reconcile this dissonance, it is reasonable to infer that one of the two Zig-Zag Corp. references is an error. Because the name *Zig-Zag Corp.* resembles *ZZC, Inc.*, it is also reasonable to infer that the Circuit Court actually meant *ZZC, Inc.* for one of the references. *See generally Divco-Wayne Sales Fin. Corp. v. Martin Vehicle Sales, Inc.*, 45 Ill. App. 2d 192, 197, 195 N.E.2d 287, 290 (Ill. App. Ct. 1963) ("Confusion often results from the operation of various related corporations especially where names similar in sound are used." (quoting *John Sexton & Co. v. Libr. Plaza Hotel Corp.*, 270 Ill. App. 107, 110 (Ill. App. Ct. 1933)).

The second, particularized reference is the reference in error for two reasons. First, it accords with the Trustee's understanding of Michael's pre-petition interests in ZZC, Inc. to presume that the Circuit Court meant Michael's "forty-nine per cent (49%) interest" in ZZC, Inc., not Zig-Zag Corp. *See* FAC ¶¶ 60–62. The Trustee similarly understood that Michael's ownership interest in Zig-Zag Corp. was always 100% (or eventually zero); it was never 49%. *Id.* ¶ 168. Second, Elizabeth advised the Circuit Court that Michael divested his interest in Zig-Zag Corp. shortly before her divorce petition. Findings & Rulings 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (dated Nov. 13, 2017). The Trustee also alleged that Zig-Zag Corp. had been dissolved at some point prior to filing his complaint. *See* FAC ¶ 38. Therefore, it is understandable that the Circuit Court would equivocate about "any interest that [Michael] might have" in Zig-Zag Corp., not ZZC, Inc.

Since the reference to Michael's 49% interest in Zig-Zag Corp. in the "Findings and Rulings" is an error, so too must be the same reference to Michael's 49% interest in Zig-Zag Corp. found in the divorce judgment's main-body text. This is the only interpretation that comports with Illinois' definition of marital property. *See* 750 Ill. Comp. Stat. 5/503(a) ("'[M]arital property' means all property . . . acquired by either spouse subsequent to the marriage . . . ."). Michael and Elizabeth married in 1975. J. for Dissolution of Marriage 1, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (judgment entered Dec. 15, 2017). Michael incorporated Zig-Zag Corp. as its sole-owner in 1987. FAC ¶ 18. Hence, it would not make sense for the Circuit Court to deem only 49% of Michael's interest in Zig-Zag Corp. to be marital property when Michael acquired 100% of his interest in Zig-Zag Corp. subsequent to his marriage.

Based on the foregoing clarification of the divorce judgment, this Court finds that Michael's marital estate consisted of his entire 100% interest in Zig-Zag Corp. and his entire 49% interest in ZZC, Inc. These interests were rendered contingent when Elizabeth petitioned for divorce in December 2013 and therefore succeeded as contingent interests to Michael's bankruptcy estate when Michael petitioned for bankruptcy eight months later. Then, in December 2017, when the divorce judgment awarded Michael's entire marital estate to Elizabeth, these contingent interests vanished from the bankruptcy estate. The question that remains is how this corrected understanding of the bankruptcy estate affects the Trustee's claims.

The most obvious impact is to the Trustee's corporate waste claim. Under the Illinois Business Corporation Act, shareholders may be afforded relief if "corporation assets are being misapplied or wasted." 805 Ill. Comp. Stat. 5/12.56(a)(4). The bankruptcy court held Scott liable for corporate waste when he transferred the MMQB business from ZZC, Inc. to MMQB, Inc. for no consideration (*i.e.*, Transfer No. 3). But the Trustee is empowered to bring this claim on behalf of the debtor's estate only if Michael possessed it "as of the commencement of the [bankruptcy] case." 11 U.S.C. § 541(a)(1); *see Biesek v. Soo Line R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006) ("Pre-bankruptcy claims are part of debtors' estates . . . ."). But as just determined, as of the commencement of Michael's bankruptcy case, Michael was no longer a shareholder of ZZC, Inc. because, according to the Illinois Circuit Court, his 49% interest in ZZC, Inc. became marital property when Elizabeth filed for divorce eight months before Michael filed a bankruptcy petition. Hence, it was an error to grant the Trustee's corporate waste claim. *See In re Thorpe*, 881 F.3d at 539–40 ("[O]nce the divorce court awarded [the non-debtor spouse] the entire marital [property] . . . [it left] the estate without a claim.").

21

The claims founded on sections 544(b) and 548 are a different matter. Those relate to Transfers Nos. 1 and 2. Michael and Scott cite *Thorpe* to argue that these claims are impaired for the same reason the Trustee's section 541 claim is—that is, because the assets involved were ultimately held to be Elizabeth's marital property. The Bankruptcy Code, they quote, only permits the Trustee to "avoid any transfer of an interest of the debtor in property . . . ." 11 U.S.C. § 544(b)(1); *see id.* § 548(a)(1) (same). It follows, they say, that the Trustee cannot avoid Transfers Nos. 1 and 2 because, in light of the divorce judgment, the predicate interests were no longer interests "of the debtor."

At least with respect to Transfer No. 2, this argument gets the facts wrong. Michael's judgment for dissolution of marriage only awarded Elizabeth his 49% interest in ZZC, Inc. The judgment did not include the additional 51% interest in ZZC, Inc. that Michael originally owned prior to its transfer to Scott (*i.e.*, Transfer No. 2).

As for Transfer No. 1, Michael and Scott are wrong on the law. Although they cite *Thorpe* as support, *Thorpe* directly contradicts their position. There, the Seventh Circuit expressly noted that—notwithstanding the effects of the Illinois Dissolution of Marriage Act on property of the debtor's estate—"fraudulent transfer laws remain a viable tool to protect the estate's assets." 881 F.3d at 542. The reason is because the Bankruptcy Code empowers trustees to avoid *past* interests of the debtor in property. Any other construction would produce absurd results. A transferred interest is by definition no longer a *present* interest of the debtor's. And accepting Michael and Scott's position—that the transferred interest must be an interest of the debtor as of the commencement of the bankruptcy case—would nullify all trustee avoidance powers save for section 549, which applies expressly to post-petition transfers. Thus, so long as the transferred interest in question was "an interest of the debtor in property" ***at the time of the***

22

*transfer*, sections 544(b) and 548 are viable. That is the case here: Transfer No. 1 occurred in early 2012, and Elizabeth did not petition for divorce until December 2013. FAC ¶¶ 52, 171.

This is not to say these avoidance powers are without limit. Under section 544(b), and in accordance with Illinois' UFTA, fraudulent transfers are avoidable except where asserted against "a person who took in good faith and for a reasonably equivalent value . . . ." 740 Ill. Comp. Stat. 160/9. Likewise, section 548 makes exception for a transferee "that takes for value and in good faith . . . ." 11 U.S.C. § 548(c). All that is left to show, then, is whether the Trustee's interest in ZZC, Inc.'s stock and the MMQB business is superior to other claimants (*i.e.*, ZZC, Inc., MMQB, Inc., and Scott). And here, no consideration was given for either Transfer No. 1 or Transfer No. 2. FAC ¶¶ 48, 63. It was therefore not improper for the bankruptcy court to grant the Trustee's sections 544(b) and 548 claims.

**B. Reverse Veil Piercing Claim**

The preceding analysis regarding Transfer No. 1 assumes that it is permissible for the Trustee to satisfy the liabilities of an individual shareholder (Michael) with corporate assets— specifically, the MMQB publication (owned at the time of Transfer No. 1 by Zig-Zag Corp.). This is what is known as a reverse veil piercing claim. Michael and Scott challenge the validity of the Trustee's invocation of reverse veil piercing on its face. In other words, they do not challenge the bankruptcy court's finding that Zig-Zag Corp. was Michael's alter ego, nor do they take issue with any of the equitable considerations the bankruptcy court relied upon in granting the Trustee's reverse veil piercing claim. They instead argue that reverse veil piercing is categorically unrecognized under Illinois law.

In Illinois, as elsewhere, "[a] corporation is a legal entity separate and distinct from its shareholders, directors, and officers." *In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 172, 632

N.E.2d 1015, 1017 (1994). "However, this separate and distinct legal entity will be disregarded, and the corporate veil pierced, where . . . observance of the fiction of separate identities would sanction a fraud or promote injustice under the circumstances." *Id.* at 172–73, 632 N.E.2d at 1017–18. The circumstances justifying piercing of the corporate veil are those "where the corporation is an alter ego or business conduit of the governing or dominant personality." *Semande v. Estes*, 374 Ill. App. 3d 468, 471, 871 N.E.2d 268, 271 (2007). Hence, to pierce the corporate veil, "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500, 840 N.E.2d 767, 776 (2005).

There are two forms of veil piercing. Conventional veil piercing "imposes liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Fontana*, 362 Ill. App. 3d at 500, 840 N.E.2d at 775–76.[7] The second form—reverse veil piercing—holds "the corporation liable for the actions of its shareholder or someone who controls the entity." 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 41.70 (rev. vol. 2022); *see Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995) ("Direct piercing of the corporate veil occurs when creditors of the corporation are trying to reach the shareholder; reverse piercing occurs when creditors of the shareholder are trying to reach the corporation."). A bankruptcy trustee is empowered by section 544(a) to assert a reverse veil-piercing claim on behalf of creditors generally. *Koch Ref. v. Farmers Union Cent.*

---

[7] Applying Delaware law, the bankruptcy court granted this form of veil piercing to impose liability on Scott after finding that MMQB, Inc. was Scott's alter ego and that MMQB, Inc. was liable under 11 U.S.C. 550(a)(2) as the subsequent transferee of Transfer No. 1. *In re Wolf*, 595 B.R. at 789–90. Scott does not challenge this holding.

*Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987).[8] Nonetheless, "reverse piercing of the corporate veil is a 'rarity,' and it is rarer yet in bankruptcy." *In re KZK Livestock, Inc.*, 221 B.R. 471, 478 (Bankr. C.D. Ill. 1998) (quoting *Scholes*, 56 F.3d at 758).[9]

Reverse veil piercing itself comes in two varieties. "'Inside reverse veil piercing' involves a controlling insider who attempts . . . to disregard the corporate form of which he or she is a part." 1 Fletcher Cyc. Corp. § 41.70. "'Outside reverse veil piercing,' sometimes referred to as 'third-party reverse piercing,' extends the traditional veil-piercing doctrine to permit a third-party creditor to pierce the corporate veil to satisfy the debts of an individual shareholder out of the corporation's assets." *Id*. Inside reverse veil piercing is not recognized in Illinois. *See Centaur*, 158 Ill. 2d at 174, 632 N.E.2d at 1018; *Semande*, 374 Ill. App. 3d at 471–72, 871 N.E.2d at 271. The narrow question presented here is whether Illinois would recognize outside reverse veil piercing in this case.

Michael and Scott rely exclusively on *In re Glick*, 568 B.R. 634 (Bankr. N.D. Ill. 2017), to argue that Illinois has not recognized outside reverse veil piercing, and therefore, the bankruptcy court impermissibly expanded Illinois law when it granted the Trustee's outside

---

[8] This holding from *Koch* is not free of controversy. *See* Richard J. Mason & Patricia K. Smoots, *When Do the Creditors' Shoes Fit?: A Bankruptcy Estate's Power to Assert the Rights of a Hypothetical Judgment Creditor*, 91 Am. Bankr. L.J. 435, 447–455 (2017) (examining inconsistent post-*Koch* analysis from the Seventh Circuit and a circuit-split over section 544(a)'s reach). Nevertheless, *Koch* remains viable. *See In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009) (reaffirming *Koch*).

[9] Michael and Scott press a confusing argument that takes issue with the **retroactive** application of section 544(a) to define Michael's property interests. *See, e.g.*, Scott Br. 31–32, No. 18-cv-07953, ECF No. 19 ("The [bankruptcy court] invented a new doctrine that allows the alter ego doctrine to rewrite history to transform property rights in the past . . . ." (citing *In re Duckworth*, No. 10-83603, 2012 WL 4434681, at *6 (Bankr. C.D. Ill. Sept. 24, 2012)). In *Duckworth*, the court rejected a trustee's "creative attempt to use the alter ego doctrine" to recover a **post**-petition transfer. *Duckworth* is therefore inapposite. *See also Belisle v. Plunkett*, 877 F.2d 512, 516 (7th Cir. 1989) ("[W]e believe that allowing the estate to benefit from property that the debtor did not own is exactly what the strong-arm powers are about." (quotation omitted)).

reverse veil-piercing claim. In *Glick*, the bankruptcy court denied an outside reverse veil-piercing

claim after finding that the propriety of reverse veil piercing in Illinois was unsettled and

difficult to predict. 568 B.R. at 664. "No Illinois decision," the *Glick* court noted, "approves

reverse piercing." *Id.* at 662. The court continued:

> Despite this dearth of authority, several federal decisions from this
> circuit assert (usually with no discussion or analysis) that Illinois
> recognizes reverse piercing. But the foundation for these assertions
> is shaky at best. The decisions tend to rely on *Boatmen's Nat'l
> Bank v. Smith*, 706 F. Supp. 30 (N.D. Ill. 1989), a pre-*Centaur* case
> in which the court found "nothing problematic about reversing the
> traditional piercing procedure" although "no Illinois court ha[d]
> squarely addressed this issue." They also rely on *Sea-Land Servs.,
> Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991), and *Scholes v.
> Lehmann*, 56 F.3d 750 (7th Cir. 1995). *Sea-Land*, another pre-
> *Centaur* case, did not address either the validity of reverse piercing
> or whether Illinois would recognize it. Neither did *Scholes*, which
> treated reverse piercing in *dictum* as a given and did not discuss
> Illinois law. For the most part, the federal decisions simply cite and
> rely on each other. The entire body of case law is nothing but a
> house of cards.

*In re Glick*, 568 B.R. at 663 (citations omitted).

Leaning heavily on *Centaur* and *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 864 N.E.2d

227 (2007)—two Illinois Supreme Court cases which reject ***inside*** reverse veil piercing—the

*Glick* court concluded that "the tenor of Illinois law suggests the state is unlikely to accept

outside reverse piercing." 568 B.R. at 663. It therefore held that "the proper tack is to let things

be rather than advance Illinois law in a direction Illinois courts have not yet taken." *Id.* at 664;

*see generally Ostrowski v. Lake Cnty.*, 33 F.4th 960, 967 (7th Cir. 2022) ("Federal courts must

exercise caution before recognizing novel legal theories brought under uncharted state laws.").

*Glick*'s appraisal of Illinois decisions appears astute. With the exception of *Crum v. Krol*,

99 Ill. App. 3d 651, 425 N.E.2d 1081 (1981), this Court has found no Illinois decision approving

a reverse veil piercing claim.[10] (*Crum* will be discussed momentarily.) *Glick*'s appraisal of federal decisions on this matter also appears astute. In *Sea-Land*, the Seventh Circuit assumes without questioning that Illinois recognizes outside reverse veil piercing before denying the claim on its merits using the conventional veil-piercing test. 941 F.2d at 520–24. In *Scholes*, the Seventh Circuit's outside reverse veil-piercing discussion is—as *Glick* labels—*dictum*. *See* 56 F.3d at 758. And in *Boatmen's*, the district court cites only two cases to support its finding that there is "nothing problematic about reversing the traditional piercing procedure [in Illinois]." 706 F. Supp. at 32. The first is *FMC Finance Corp. v. Murphee*, wherein the Fifth Circuit rules that an outside reverse veil-piercing question should have been submitted to the jury. 632 F.2d 413, 422 (5th Cir. 1980). Much like *Sea-Land*, however, it simply assumes the doctrine is supported in Illinois alongside conventional veil piercing. *See id.* at 422–24. The second case is *Crum*.[11]

On its face, *Crum v. Krol* is a decision granting an inside reverse veil-piercing claim. *See* 99 Ill. App. 3d at 660–662, 425 N.E.2d at 1088–89. Given the subsequent decisions in *Centaur* and *Forsythe* rejecting inside reverse veil piercing, the *Glick* court declared that "*Crum* is no longer good law." 568 B.R. at 663. But this is not so certain. *See Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1050, 869 N.E.2d 1147, 1171 (2007) (citing but not discussing *Crum*'s durability in the wake of *Centaur* and *Forsythe*). Neither *Centaur* nor *Forsythe* cite *Crum*, and despite the *Crum* court's own characterization that it was "allowing an 'insider' to pierce the corporate veil from within the corporation," *see* 99 Ill. App. 3d at 661, 425 N.E.2d at 1088, *Crum*

---

[10] The Trustee apparently cannot find one either. *See* Trustee Br. 91, No. 18-cv-07952, ECF No. 41. He also only addresses *Glick* insofar as to distinguish its procedural posture from that of this case. *Id.* at 91 n.17. But the fact the *Glick* was decided on a motion to dismiss rather than a motion for default judgment does nothing to undermine the legal proposition for which Michael and Scott cite *Glick*.

[11] In actuality, *Boatmen's* cites a third case: *Earp v. Schmitz*, 334 Ill. App. 382, 79 N.E.2d 637 (1948). However, *Earp* is cited and discussed in *Crum*, *see* 99 Ill. App. 3d at 661, 425 N.E.2d at 1089; therefore, its survey here would be redundant.

does not readily fit *Centaur*'s definition of inside reverse veil piercing. In *Crum*, the Illinois appellate court, employing the alter ego doctrine, affirmed the joinder of the plaintiff's corporation during closing arguments in a breach of contract trial. *Id.* at 660, 425 N.E.2d at 1088. The joinder allowed the plaintiff—standing in the shoes of his wholly-owned corporation, a third-party beneficiary to the contract—to collect the corporation's reliance damages. *Id.* at 662, 425 N.E.2d at 1089. Hence, *Crum* is not a case where an insider attempts to pierce the corporate veil in order to "bring[] an action ***against*** its . . . corporation," *Centaur*, 158 Ill. 2d at 174, 632 N.E.2d at 1018 (emphasis added), and it is a far cry from allowing an insider "to pierce its own corporate veil in order to ***avoid liability***," *Forsythe*, 224 Ill. 2d at 297, 864 N.E.2d at 241 (emphasis added).

Although outside reverse veil piercing typically focuses on injustices perpetuated ***against*** third parties, *Crum*, in this Court's reading, simply stands for the proposition that Illinois does not doggedly adhere to the corporate form whenever doing so would sanction an injustice perpetuated ***by*** a third party. *See* 99 Ill. App. 3d at 661, 425 N.E.2d at 1088–89 ("While we realize that the concept of a 'reverse pierce' has not been at issue in the overwhelming number of the corporate veil cases, we believe the same equitable considerations of preventing injustice apply when it is a third party, rather than a shareholder or officer, who attempts to use the corporate entity as a shield."); *see also Earp v. Schmitz*, 334 Ill. App. 382, 388, 79 N.E.2d 637, 639 (1948) ("[I]t is not only where third parties need protection that the courts have thought it just to treat a corporation and its sole stockholder as one and the same person."). In this way, *Crum* is distinct from *Centaur* and *Forsythe* and is ostensibly good law. Nevertheless, *Crum* still does not provide direct support for the proposition that Illinois recognizes outside reverse veil piercing. It does, however, provide some indication as to whether the Illinois Supreme Court

would. *See generally Neth. Ins. Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013) ("In the absence of Illinois Supreme Court precedent, [federal courts] must use [their] best judgment to determine how that court would construe its own law, and may consider the decisions of the Illinois appellate courts, well-reasoned decisions from other jurisdictions, as well as persuasive authorities." (internal quotations omitted)). Contrary to the *Glick* court, then, this Court does not find Illinois law to be prohibitively unpredictable.

This Court's own reading of Illinois law supports the notion that the Illinois Supreme Court views conventional veil piercing and outside reverse veil piercing as the same doctrine and would therefore approve of the latter. *See generally* 1 Fletcher Cyc. Corp. § 41.70. ("Many, but not all, jurisdictions recognize that the same considerations justifying piercing the corporate veil may justify piercing the veil in 'reverse.'"). In *Main Bank of Chicago v. Baker*, for instance, the Illinois Supreme Court referenced both conventional and outside reverse veil piercing as though the doctrines were interchangeable: "[O]rdinarily . . . a party seeks to pierce the corporate veil to hold a parent liable for its subsidiary's acts [read: conventional veil piercing] or the subsidiary responsible for the acts of its parent [read: outside reverse veil piercing] . . . ." 86 Ill. 2d 188, 205, 427 N.E.2d 94, 101 (1981). A year prior to *Baker*, an Illinois appellate court also viewed both doctrines as coterminous: "The judgment [below] . . . pierc[ed] the corporate veil in reverse interposition of its customary orientation. Whether sought to be pierced in either direction, however, . . . [t]he distinction between a corporation and its owner may be disregarded only when recognition of the separate identities of the two would be fraudulent or promote illegality." *Bankers Tr. Co. v. Chi. Title & Tr. Co.*, 89 Ill. App. 3d 1014, 1019, 412 N.E.2d 660, 663 (1980); *see also id.* at 1019, 412 N.E.2d at 664 (declining to grant the outside reverse veil-piercing claim based on the facts before it).

Based on the foregoing, this Court concludes that Illinois would recognize outside reverse veil piercing generally. This assessment is in harmony with *Scholes* and *Sea-Land*—whose tacit approval of the same, while not dispositive, has nonetheless spawned a significant body of similar precedent within this circuit. *See In re Glick*, 568 B.R. at 663 n.26 (collecting federal cases relying on *Scholes*, *Sea-Land*, and *Boatmen's* to support Illinois outside reverse veil piercing). Given *Scholes*' and *Sea-Land*'s resonance, it is also telling that the Illinois Supreme Court has refrained from disagreeing with the Seventh Circuit in the thirty-one years since *Sea-Land. See Wesbrook v. Ulrich*, 840 F.3d 388, 399 (7th Cir. 2016) ("The state courts are quite capable of signaling when they disagree with a federal court's interpretation of state law.").

This Court also predicts that Illinois would recognize outside reverse veil piercing in this case specifically. Michael and Scott wield a handful of policy arguments to claim otherwise. To summarize, Michael and Scott argue that innocent shareholders and creditors of Zig-Zag Corp. will be prejudiced if Zig-Zag Corp.'s corporate assets are used to satisfy Michael's personal debts. *Cf. Acree v. McMahan*, 276 Ga. 880, 881, 585 S.E.2d 873, 874 (2003) (echoing the same concerns; noting that some jurisdictions require proof "that no innocent third-party creditor or shareholder would suffer harm or prejudice as a consequence of reverse veil-piercing and that there is no other available remedy, such as the usual judgment collection procedures"); *Scholes*, 56 F.3d at 758 ("Reverse piercing is ordinarily possible only in one-man corporations, since if there is more than one shareholder the seizing of the corporation's assets to pay a shareholder's debts would be a wrong to the other shareholders. . . . Even in one-man corporations . . . a simple transfer of the indebted shareholder's stock to his creditors will usually give them all they could get from seizing the assets directly."). But this concern is misplaced here. Michael was Zig-Zag Corp.'s ***sole*** shareholder, so there are no innocent shareholders to speak of. And to the extent that

Zig-Zag Corp. may have innocent creditors, those creditors—given that Zig-Zag Corp. was found to be Michael's alter ego—may protect their interests in bankruptcy court along with the rest of Michael's creditors.

In short, the bankruptcy court did not misapply Illinois law by granting the Trustee's outside reverse veil piercing claim.

## C. Rule 9(b) Challenge to Transfer No. 2 Claims

With respect to Transfer No. 2, Scott also argues that the Trustee failed to allege fraud with particularity in accordance with Federal Rule of Civil Procedure 9(b)—a rule that applies to fraudulent transfer claims, both actual and constructive. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997) (constructive); *Peterson v. Colony Am. Fin. Lender LLC*, 634 B.R. 1010, 1020 (Bankr. N.D. Ill. 2021) (actual); Fed. R. Bankr. P. 7009 (applying Rule 9(b) to adversarial proceedings).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). Ordinarily, this "requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *accord DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Here, Scott contends that the *what* and *when* elements of Transfer No. 2 were inadequately pled.[12]

---

[12] Scott also argues that the Trustee impermissibly based his allegations regarding Transfer No. 2 "on information and belief." *See* FAC ¶¶ 19, 20, 180, 184. Indeed, the Seventh Circuit does "frown on making allegations 'on information and belief' in the fraud context and generally find[s] that such claims do not meet Rule 9(b)'s particularity requirement." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013). However, "the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id.* (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011)) (alterations removed). These two conditions are present here; therefore, the allegations made "on information

Recall that Transfer No. 2 refers to the transfer of 51% of ZZC, Inc.'s stock from Michael to Scott. The *what* element of Transfer No. 2, then, is ZZC, Inc.'s stock. The issue, however, is that there were evidently two companies incorporated under the name ZZC, Inc. In the "Parties" section of the complaint, the Trustee alleges that Michael incorporated one ZZC, Inc. in Illinois in December 2011 and another in Delaware during the same month. FAC ¶¶ 19–20. This is the only reference to ZZC, Inc. as two companies. Everywhere else in the complaint, the Trustee simply refers to ZZC, Inc. without identifying whether it is the Illinois or the Delaware company. *See, e.g.*, *id.* ¶¶ 180–85. The bankruptcy court, for its part, intentionally treated each company as one and the same. *In re Wolf*, 595 B.R. at 747 n.1. In so doing, the bankruptcy court applied both Illinois and Delaware law where pertinent, *see id.* at 770, 784; but otherwise, ZZC, Inc.'s supposed duality had no meaningful effect on the default judgment.

As for *when* Transfer No. 2 occurred, the operative complaint provides two guideposts. First, ZZC, Inc.'s 2012 tax return allegedly lists Michael as owner of 100% of ZZC, Inc.'s common and preferred stock. FAC ¶¶ 49, 181. Then in July 2014, Michael's bankruptcy schedule claimed he owned only 49% of ZZC, Inc. *Id.* ¶ 61. Thus, according to the complaint, Transfer No. 2 occurred sometime between the end of 2012 and July 2014; or as the bankruptcy court put it: "no earlier than in 2013 . . . ." *In re Wolf*, 595 B.R. at 764.

Despite Scott's insistence, these two ambiguities within the Trustee's complaint do not breach Rule 9(b). Rule 9(b) requires "[h]eightened pleading . . . in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits*

---

and belief" are permitted. In any event, not all relevant allegations are asserted "on information and belief," and sufficient particularities for Transfer No. 2 may be gleaned from the complaint by relying exclusively on the allegations that omit the qualifier.

*Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). To assure that a charge of fraud is responsible and supported, plaintiffs are expected "to conduct a precomplaint investigation in sufficient depth . . . ." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). However, "Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996). "[C]ourts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Pirelli*, 631 F.3d at 443. Thus, "[t]he degree of particularity required will necessarily vary depending on the circumstances . . . ." *Gandhi v. Sitara Cap. Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013). For instance, when details are within the defendant's exclusive knowledge or when a plaintiff is alleging fraud against a third party, specificity requirements may be relaxed. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) (exclusive knowledge); *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (third party). Under these circumstances, a plaintiff must allege enough grounds for their suspicions sufficient to make fraud appear plausible. *Pirelli*, 631 F.3d at 443. Because bankruptcy trustees inevitably lack knowledge concerning acts of fraud previously committed against debtors or third parties, bankruptcy cases "have held that the Rule 9(b) requirement of particularity is relaxed" in cases involving bankruptcy trustees. 10 Collier on Bankruptcy ¶ 7009.03 (16th ed. 2022); *see, e.g.*, *In re Mack Indus., Ltd.*, 622 B.R. 887, 896 (Bankr. N.D. Ill. 2020); *In re Grube*, 500 B.R. 764, 776 (Bankr. C.D. Ill. 2013); *In re Hearthside Baking Co., Inc.*, 402 B.R. 233, 255 (Bankr. N.D. Ill. 2009).

The circumstances here similarly justify a relaxed particularity standard. At least until Elizabeth filed her divorce petition, ZZC, Inc. was always a privately owned corporation held entirely by Michael and Scott. The transfer in question also occurred between immediate family

members—Michael and Scott. Thus, the details that Scott claims are missing from the Trustee's complaint are in their exclusive control. This is also a situation where the Trustee's fraudulent transfer claims are asserted on behalf of third parties (*i.e.*, Michael's creditors). No more particularity is possible, then, without discovery.[13]

In light of these considerations, the Trustee's grounds for suspicion are sufficient. The bankruptcy court identified five "badges of fraud" within the Trustee's complaint (four of those, the court said, were "conclusive" indications of fraudulent intent). *In re Wolf*, 595 B.R. at 776–77. These badges comprised facts indicating that (1) the transferee (Scott) shared a close familial relationship with the debtor (his father); (2) Michael received no consideration for Transfer No. 2; (3) Transfer No. 2 was concealed; (4) Michael became insolvent at the time of Transfer No. 2; and (5) Transfer No. 2 potentially occurred after Michael was threatened with suit by a creditor (Elizabeth). *Id*.

Scott challenges none of these. The ambiguities he does challenge do not deprive him of sufficient notice of the claim against him. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013) (one purpose behind Rule 9(b) is to provide adequate notice "so that opposing parties can respond effectively"). For instance, the *what* element permits exactly two possibilities: stock from one of the two wholly-owned, identically-named companies that Michael incorporated in December 2011. Furthermore, if Michael's representations before the Illinois Circuit Court are to be believed, Michael never incorporated an Illinois variant of ZZC, Inc. *See* Resp. to Divorce Pet. 10, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Apr. 16, 2016),

---

[13] While not relevant to Scott's Rule 9(b) challenge, it is worth noting that the record in this matter is replete with bad faith and contemptuous refusal from Michael and Scott to participate in even the most basic forms of discovery. *See, e.g.*, Order of Default 2–4, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Apr. 13, 2017), ECF No. 444 (reviewing Michael's sanctionable conduct); Order of Default 3–5, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. May 24, 2018), ECF No. 574 (reviewing Scott's).

ECF No. 71-2. Therefore, based on the complaint, Scott should have little trouble understanding what stock the Trustee is alleging he fraudulently received.

The Trustee also isolates *when* Transfer No. 2 occurred to a 19-month window: between January 2013 and July 2014.[14] This timeframe may be too ambiguous for Rule 9(b) if viewed in isolation, *cf. Beyrer*, 722 F.3d at 950 (rejecting a 7-month timeframe); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 774, 778 (7th Cir. 1994) (rejecting a 10-month timeframe); but given that the details needed to narrow it are within Michael and Scott's exclusive possession, and in light of the badges of fraud, Rule 9(b) is satisfied.

Scott argues that permitting a timeframe this broad for Transfer No. 2 has implications beyond Rule 9(b). True, if Transfer No. 2 occurred sometime after Elizabeth petitioned for divorce in December 2013 **and** the entirety of Michael's interests in ZZC, Inc. transferred to Elizabeth via their marital estate, then the transferred property interests in question would have been Elizabeth's, not Michael's. Such finding would vitiate the Trustee's ability to avoid Transfer No. 2 under sections 544(b) and 548. That must mean, Scott says, that the complaint is insufficiently particular. Not so. A sufficient complaint is a prerequisite for default judgment. *See Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994) ("The entry of a default order does not . . . preclude a party from challenging the sufficiency of the complaint."); *Nishimatsu Constr. Co., Ltd. v. Hous. Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("[A] defendant's default does not in itself warrant the court in entering a default judgment. . . . The defendant is not held to admit

---

[14] In actuality, the Trustee could have further tapered this time window. The record contains at least two claims by Michael that he was "fired" from ZZC, Inc. by Scott in February 2014. *See* Resp. to Divorce Pet. 19, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Apr. 16, 2016), ECF No. 71-2; Schedule of Personal Property 2, *In re Wolf*, No. 14-bk-27066 (Bankr. N.D. Ill. July 23, 2014), ECF No. 1. If so, Michael had transferred a controlling share of ZZC, Inc. to Scott by February 2014. The Trustee's complaint does not reference these extrinsic claims by Michael; therefore, the sufficiency of the complaint is judged without them.

facts that are not well-pleaded or to admit conclusions of law."); *Terio v. Great W. Bank*, 166 B.R. 213, 218 (S.D.N.Y. 1994) ("The conclusion that the complaint is subject to dismissal strongly militates against granting Plaintiff's application for a default judgment."). But this does not mean that a complaint is insufficient simply because it cannot support default judgment on the strength of its factual allegations alone. The Federal Rules of Civil Procedure expressly permit a court, in granting a default judgment, to consider extrinsic evidence to, among other reasons, "establish the truth of any allegation." Fed. R. Civ. P. 55(a)(2); *see also Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014) (a court's grant of default judgment is reviewed only for an abuse of discretion). And here, neither this Court nor the bankruptcy court read the judgment for dissolution of marriage as including within the marital estate the 51% of ZZC, Inc. that Scott received from Michael.

The bankruptcy court did not err in holding the Trustee's complaint sufficient.

## D. Denial of Discharge

The bankruptcy court denied Michael's discharge for four independent reasons. Michael assigns error to all of them.[15] This Court need affirm only one to uphold the judgment.

Among other reasons, a bankruptcy debtor's debt will not be discharged if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the

---

[15] The Trustee contends that Michael's arguments contesting the denial of his discharge are waived because he did not raise them below. That is not correct. *See* Mot. for Recons. 4–11, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Nov. 30, 2018), ECF No. 670; Denial Order 1, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Dec. 21, 2018), ECF No. 694 ("[T]he [denial of discharge] issues raised by Michael . . . have already been considered by the court and were addressed in the court's opinion.").

petition . . . ." 11 U.S.C. § 727(a)(2)(A). The bankruptcy court held that the sham "sale" of Michael's Aston Martin luxury automobile fit this criterion.

According to the operative complaint, after Elizabeth petitioned for divorce, the Illinois Circuit Court ordered Michael to sell his Aston Martin and relinquish the proceeds to Elizabeth's attorneys. FAC ¶ 115. Michael sold the vehicle to a dealership, which then sold it to Ma Cherie LLC, an entity wholly owned by Scott. *Id.* ¶¶ 118–19. Scott, it turns out, allowed Michael to retain possession of the vehicle. *Id.* ¶ 120. Michael also contemptuously retained possession of the sale proceeds. *Id.* ¶¶ 123–24. The bankruptcy court found that these actions constituted a transfer, removal, or concealment of Michael's property, perpetuated or permitted by Michael with the "intent to hinder, delay, or defraud a creditor"—namely, Elizabeth.

Michael argues that he did not intend to defraud a creditor through the sham Aston Martin sale because Elizabeth is not a "creditor" within the meaning of section 727(a)(2). But under the Bankruptcy Code, a "creditor" is simply any "entity that has a claim against the debtor . . . ." 11 U.S.C. § 101(10). A "claim" means "any right to payment, whether or not such right is . . . disputed . . . ." *Id.* § 101(5). In bankruptcy, Elizabeth filed a claim against the estate. R. at 1–4, No. 18-cv-07952, ECF No. 14 (Proof of Claim). Thus, regardless of whether this claim is meritorious, Elizabeth is a "creditor." *See Sears v. Sears*, 863 F.3d 980, 984 (8th Cir. 2017) ("Whether the [claimants'] claims should have been allowed is distinct from whether the [claimants] were creditors."); *In re Holstein*, 299 B.R. 211, 224–25 (Bankr. N.D. Ill. 2003) ("Since the holder of a disputed claim is a 'creditor,' . . . the creditor has standing to seek denial of the debtor's discharge notwithstanding the dispute.").

A bankruptcy debtor's debt will also not be discharged if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account . . . ." 11

U.S.C. § 727(a)(4)(A). The bankruptcy court denied Michael's discharge on this ground as well, highlighting that Michael "testified . . . under oath in the[] bankruptcy proceedings that he ***never*** owned more than 49% of the shares of ZZC, Inc. . . . ." FAC ¶ 62 (emphasis in original). Michael made this statement when, at the outset of his bankruptcy case in 2014, he filed a schedule of personal property indicating he owned only 49% of the shares in ZZC, Inc. This statement contradicts ZZC, Inc.'s 2012 tax return, which identifies Michael as its sole owner. So, the Trustee concluded, either Michael's 2014 bankruptcy schedule or ZZC, Inc.'s 2012 tax return is false. *See id*.

Michael counters that this contradiction cannot justify denial of discharge because ***his*** schedule was true and it was ***ZZC, Inc.***'s tax return that was false. Section 727(a)(4), he points out, only operates if the ***debtor*** makes a false oath or account. *See Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (For a section 727(a)(4) denial, "the Trustee must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.").

Michael's argument might have potency if he were simply defending against denial of discharge; but here, he is defending against a motion for default judgment. In that context, as discussed in part I, he has lost his right to contest the factual assertions of the operative complaint. *VLM Food*, 811 F.3d at 255. The complaint, in turn, adequately alleges that Michael "owned 100% of the shares of stock of ZZC, then claimed that he was not actually the 100% owner of ZZC . . . ." FAC ¶ 60. Hence, regardless of the veracity of ZZC, Inc.'s 2012 tax return, Michael's statement before the bankruptcy court that he never owned more than 49% of ZZC, Inc. is—in light of the complaint and as a matter of law—false.

The two independent justifications just upheld are one more than is necessary to deny Michael's discharge. This Court will not belabor the issue any further by examining the bankruptcy court's additional justifications. The denial of Michael's discharge is affirmed.

### E. Dismissal of the Third-Party Complaint with Prejudice

Michael also appeals the dismissal of his third-party complaint. The bankruptcy court dismissed his complaint because it was not "a short and plain statement" of his claims for relief. *See* Fed. R. Civ. P. 8(a)(2). It also issued the dismissal with prejudice after finding that no amendment could cure the complaint of its failings under the *Barton* doctrine and a host of statutory bars. Michael is joined in this appeal by his second adult son, Peter Wolf.

To this point, it has not been necessary to chronicle Peter's involvement in this litigation. Suffice to say, Peter joined in his father's third-party complaint, alleging that the Trustee violated his Constitutional rights and caused him severe emotional distress when—pursuant to a bankruptcy court removal order—the Trustee disposed of personal property left in one of Michael's houses. The Trustee, for his part, needed to remove property that Peter left on the premises in order to sell the house. Peter did not object to the removal order. Nor, despite the order, did he remove any of the property himself.

Peter is particularly relevant now because he is the only one with standing to appeal the dismissal of the third-party complaint. "Standing relates to who may pursue a claim[] . . . [and] there is a 'general prohibition on a litigant's raising another person's legal rights . . . .'" *In re Blasingame*, 585 B.R. 850, 864 (B.A.P. 6th Cir. 2018), *aff'd*, 920 F.3d 384 (6th Cir. 2019) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citations omitted)). In this regard, "[a]n unequivocal and complete assignment [of claims] extinguishes the assignor's rights . . . and leaves the assignor without standing . . . ." *Matter of*

*Motors Liquidation Co.*, 689 F. App'x 95, 96 (2d Cir. 2017) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984)). Here, pursuant to their judgment for dissolution of marriage, Michael assigned his claims to Elizabeth.[16] *Cf. In re XMH Corp.*, 647 F.3d 690, 693 (7th Cir. 2011) ("A party can lose its case in the lower court, and then assign the claim on which its case is based to someone else, and the assignee can take the case up on appeal."). Michael therefore has no standing to appeal the dismissal of his complaint.

Turning back to Peter, he argues that the Wolf complaint was not, as the bankruptcy court characterized it, "nearly impossible to follow or analyze." *See* Dismissal Order 3, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Dec. 16, 2016), ECF No. 407. As proof, he contends that "the Trustee's counsel seemingly had no problem following or analyzing the [complaint]" because, in filing a motion to dismiss, the Trustee attached "two charts that clearly illustrate each . . . claim presented" and "who would be liable." Michael Br. 23, No. 18-cv-07952, ECF No. 28. But just because a defendant can serviceably arrange a plaintiff's mess does not relieve the plaintiff of its duty to not make one. *See U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("[E]ven if it were possible to navigate through these papers . . . , why should the court be obliged to try?"). Those charts, by the way, merely list the name of each claim, the associated defendant(s), and the relevant paragraphs within the complaint, yet they still span twelve pages. *See* Exs. A & B to Mot. to Dismiss, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Nov. 14, 2016), ECF No. 282-2.

---

[16] In relevant part, the judgment states: "[Michael] assigns [various property interests and] . . . any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter-claim on file) to [Elizabeth]. Based upon [Michael's] offer, the Court will . . . award those properties to [Elizabeth] . . . ." Findings & Rulings 3, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (dated Nov. 13, 2017). *See also* part IV.A.

"Some complaints are windy but understandable. Surplusage can and should be ignored." *Garst*, 328 F.3d at 378. Nonetheless, "[l]ength may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter." *Id*. In that case, "length and complexity may doom a complaint by obfuscating the claim's essence." *Id.*; *see, e.g.*, *id.* at 379 (155 pages, 400 paragraphs); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702–03 (3d Cir. 1996) (240 pages, 600 paragraphs); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994) (119 pages, 385 paragraphs); *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 806 (N.D. Ill. 2014) (127 pages, 745 paragraphs). At 374 pages, 108 counts, and 1,928 paragraphs, Michael and Peter's complaint not only joins that ignominious class, it transcends it.

Peter correctly notes that "[p]ro se complaints are construed more forgivingly than a pleading prepared by a lawyer." *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020). However, the essence of this relaxed standard "is to give a pro se plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998)). "Otherwise understandable" is the key phrase, and that is not the case here. The bankruptcy court was therefore not out of bounds in dismissing the complaint on Rule 8 grounds.

The more potent issue is whether it was correct to dismiss the complaint with prejudice. Courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "the grant or denial of an opportunity to amend is within the discretion of the [court]." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, neither Michael nor Peter sought leave to amend after the dismissal of their complaint. Hence, the bankruptcy court could not have

abused its discretion. *See James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006) (The district judge "did not abuse his discretion in denying leave to amend the complaint, because such leave was never sought." (quoting *Coates v. Ill. State Bd. of Ed.*, 559 F.2d 445, 451 (7th Cir. 1977)). The dismissal of their complaint is affirmed.

### F. Denial of Costs

Finally, Michael and Scott appeal from the denial of costs in the voluntarily dismissed adversarial proceedings. Their request before the bankruptcy court was made pursuant to both Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1927.

Rule 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Michael and Scott argue they were "prevailing parties" and thus an award of costs was deserved. True, a voluntary dismissal without prejudice may render the opposing party a "prevailing party" within the meaning of Rule 54. *Gwin v. Am. River Transp. Co.*, 482 F.3d 969, 975 (7th Cir. 2007) (citing *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1015 (7th Cir. 1985)). That is, however, only if the voluntary dismissal terminates a "substantial part of the litigation." *See First Commodity Traders*, 766 F.2d at 1015 (quotation omitted). Consider also that "[a]dversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case . . . ." *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990). In view of the overall bankruptcy case, not just the dismissed adversarial proceedings, and given the default judgment rendered against Michael and Scott, it stands to reason that Michael and Scott have not prevailed on a substantial part of the litigation. They are therefore not "prevailing parties."

Even if Michael and Scott could be considered "prevailing parties," Rule 54 is not a mandate. "[T]he decision whether to award costs ultimately lies within the sound discretion of the . . . court." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). Courts often deny costs to a prevailing party if, for example, "the prevailing party, through bad faith or dilatory tactics, has turned a relatively simple case into a complex morass." *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 467 (3d Cir. 2000). Or, say, if the prevailing party has forced the court to endure "repeated and abusive hardball tactics," a "gun shot" litigating approach, or "obfuscatory defense strategies." *See Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 539–40 (5th Cir. 1990). Or if the prevailing party has "unjustifiably refused to produce documents in response to discovery, violating an order to compel" and "unnecessarily led [the] plaintiff on a 'wild goose chase.'" *See id*. According to the bankruptcy court, all of these examples aptly describe Michael and Scott's conduct throughout this case:

> [S]aying exactly what constitutes bad faith has been the subject of some uncertainty, courts have used phrases such as harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, et cetera, every one of those phrases could be applied to either Scott Wolf or Michael Wolf in this case. There has been unnecessary delay. There have been voluminous pleadings without good cause, and the cost of litigation has been driven up by [their] actions. [They] have done everything [they] could to put impediment in the way of the trustee pursuing discovery.

Trustee Br. 6, No. 18-cv-08154, ECF No. 17 (quoting Dec. 3, 2019, Bankr. Hr'g Tr.). In short, the bankruptcy court did not abuse its discretion in denying costs pursuant to Rule 54(d).

As for section 1927, it states that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The

43

denial of these sanctions falls within a court's discretion. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013).

Recall that early in this matter the bankruptcy court ordered the Trustee's initial adversarial proceeding split into seven different adversarial proceedings. The court felt Local Bankruptcy Rule 7020-1 compelled it, but afterwards reconsidered that interpretation. Nonetheless, several of these adversarial proceedings remained active after the bankruptcy court issued a final default judgment against Michael and Scott for the value of the MMQB business. The proceedings involved claims asserted by the Trustee to recover fraudulently transferred MMQB proceeds. The Trustee, however, could no longer afford the forensic investigation necessary to prove up these damages and chose to drop the claims.

Michael and Scott allege that the Trustee never intended on proving these claims and therefore deserves sanctions for needlessly multiplying the adversarial proceedings. They offer absolutely nothing, however, to substantiate their allegations of bad faith. They also conveniently overlook the fact that it was the bankruptcy court that originally ordered the Trustee to split his claims into multiple proceedings. The bankruptcy court's denial of section 1927 sanctions is therefore affirmed.

The Trustee counters that Michael and Scott should be sanctioned under Federal Rule of Appellate Procedure 38 for frivolously appealing the denial of their Rule 54(d) and section 1927 claims. The bankruptcy court would ostensibly agree. *See* Trustee Br. 5, No. 18-cv-08154, ECF No. 17 ("I think the fact that you even bring [this matter] up is very close to, if it is not, a Rule 11 sanctionable statement." (quoting Dec. 3, 2019, Bankr. Hr'g Tr.)). But "a request for Rule 38 sanctions must be made by separate motion." *In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 812 (7th Cir. 2019). Here, the Trustee merely requests sanctions in a section of his appellate

brief, and a "brief-borne request is not a separately filed motion." *Id.* (quoting *McDonough v. Royal Caribbean Cruises, Ltd.*, 48 F.3d 256, 258 (7th Cir. 1995)). Accordingly, the Trustee's Rule 38 request is denied.

*     *     *

In conclusion, this Court assigns error to only one of the bankruptcy court's rulings. Michael was not a ZZC, Inc. shareholder on the day he petitioned for bankruptcy, and thus, the bankruptcy court erred in finding Scott liable for corporate waste under section 541(a)(1). However, this error is harmless. The bankruptcy court did not err in finding Scott liable as the subsequent transferee of Transfer No. 1, and that liability independently supports the judgment against Scott for $2,100,000. *Cf. Jennings v. Stephens*, 574 U.S. 271, 277 (2015) (appellate courts review lower court judgments, not opinions). The bankruptcy court's final default judgment is therefore affirmed. Judgment will be entered for the appellees.

Date: September 30, 2022

John J. Tharp, Jr.
United States District Judge